# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs February 10, 2004

## JOE DAVIS MARTIN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 96-A-155     J. Randall Wyatt, Jr., Judge**

---

**No. M2003-00534-CCA-R3-PC - Filed March 10, 2004**

---

The petitioner appeals the denial of his post-conviction relief petition relating to his convictions for first degree murder, attempted first degree murder, and attempted second degree murder. On appeal, the petitioner contends: (1) the state withheld exculpatory evidence; (2) the state failed to correct perjured testimony at trial; and (3) he received ineffective assistance of counsel at trial. Upon review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

David M. Hopkins (on appeal) and Mike Anderson (at hearing), Nashville, Tennessee, for the appellant, Joe Davis Martin.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Thomas B. Thurman, Deputy District Attorney General; and Katrin Novak Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner was convicted of premeditated first degree murder of Jermiyer Warfield, attempted first degree murder of Kevin Robinson, and attempted second degree murder of Timothy Miller resulting from a drive-by shooting on December 17, 1995.[1] *See* State v. Ladonte Montez Smith, Joe Davis Martin, and Shaun Fly Smith, No. M1997-00087-CCA-R3-CD, 1999 Tenn. Crim. App. LEXIS 1276, at *16 (Tenn. Crim. App. Dec. 17, 1999), *perm. to app. denied* (Tenn. 2000). The petitioner received a sentence of life with the possibility of parole for his first degree murder

---

[1] Co-defendants Ladonte Montez Smith and Shaun Fly Smith were tried along with the petitioner and were each convicted of first degree murder and two counts of attempted first degree murder.

conviction, a twenty-year sentence for his attempted first degree murder conviction, and a ten-year sentence for his attempted second degree murder conviction. *See id.* at ** 17, 59-60. The trial court ordered the petitioner to serve his twenty-year and ten-year sentences concurrently with each other but consecutively to his life sentence. *See id.* at *60.

## I. FACTS

We glean the following facts from this court's opinion on direct appeal:

> Arnett Hayes testified that on Sunday, December 17, 1995, he and Chevron "Chevy" McAfee were driving around in a car Hayes had borrowed for the day from William "Tiger" Harris as part of a drug transaction. McAfee wanted to go to the home of the Smith defendants' mother, and despite Hayes's preference to the contrary, he drove to the residence. When they arrived, Hayes observed a suspicious gray van sitting ten to fifteen feet from the house with its lights on. Upon seeing the van, Hayes and McAfee drove to Vira [sic] Ashby's house. Vira [sic] Ashby is Dallas Smith's girlfriend; Dallas Smith is the Smith defendants' brother. The defendants, Gary Jordan, Mitchell "Mo" Smith, Vira [sic] Ashby, and other persons were there. After a while, Hayes told the Smiths what he had seen at their mother's house. The defendants became animated and anxious to go to the house. Defendant Shaun Fly Smith asked to use the car Hayes was driving, and Hayes agreed. . . . The defendants and Gary Jordan went into the back room and retrieved guns, coats, gloves, and ski masks. [The petitioner] had a long rifle-like gun; Gary Jordan had a shorter gun with a pump on the end; Defendant Ladonte Montez Smith had a Tec-9 or an Uzi. Hayes did not see Shaun Fly Smith with a gun, but he thought Smith probably had one.

> About an hour and a half later, Vira [sic] Ashby received a phone call. After the call, she informed Hayes that he was to say the car had been stolen and that he should not talk to the police. She also informed him not to worry, "they" would take care of the problem and the car. Ashby also informed Mitchell Smith, "The problem was solved. It was through, taken care of." Ashby later received a second call. According to Hayes, the caller wanted everyone to leave the house and for the guns "and stuff" to be put up. Hayes observed others in the house put guns in the attic. Hayes spoke with Shaun Fly Smith by telephone two times. Smith told Hayes to say that he had been robbed of the car at a market down the street by individuals wearing ski masks. If Hayes was taken to jail, he should not talk to the police, and Smith would hire an attorney for Hayes.

> . . .

> Gary Jordan, a state witness, testified that he was being held on a first degree murder charge and two attempted first degree murder charges. He was testifying for

the state as part of an agreement whereby his case was severed from that of the Smiths and [the petitioner], and he hoped to gain favorable consideration at sentencing for his truthful testimony.

In December 1995, Jordan was living back and forth between Vira [sic] Ashby's house and his aunt's house. Jordan's aunt is the Smiths' mother. About two weeks before December 17, 1995, Jordan and Shaun Fly Smith committed an armed robbery of Willie Gene, who is an associate of Phillip Patton, and someone named Cory. The heist yielded four kilos of cocaine, which had a street value in excess of $100,000. Jordan had expected to get one kilo for his participation in the crime, but he received nothing. Nevertheless, he testified he was not upset that he had not received anything.

According to Jordan, on December 16[,] Mitchell Smith, who is the Smith defendants' brother, was shot in the foot outside his mother's home. Jordan believed the shooting was in retaliation for the robbery Jordan and Shaun Fly Smith committed approximately two weeks earlier. Prior to Mitchell Smith being shot, Jordan had overheard Shaun Fly Smith arguing on the telephone about the robbery. After Mitchell Smith was shot, Shaun Fly Smith asked Jordan to get some ammunition, ski masks and gloves, which Jordan did.

. . .

Jordan stood guard at Ashby's house all night on December 16 and the morning of December 17. When he woke up in the early afternoon, Arnett Hayes and Chevron McAfee were discussing a suspicious van they had seen in front of the Smiths' mother's house. Jordan and the defendant selected weapons–Jordan had a 12 gauge Bryan pump shot gun, Shaun Fly Smith had a 9 millimeter Glock, Ladonte Montez Smith had an assault rifle. [The petitioner] had a .44 revolver and an assault rifle. The defendants and Jordan also took ski masks and gloves. They loaded into a car they got from Hayes. They drove by the Smiths' mother's house and through a housing project known as "Dodge City" but saw no sign of the van. They also checked some houses where some of the people associated with Phillip Patton lived. According to Jordan, they thought Phillip Patton's associates were behind Mitchell Smith's shooting.

Finally, at about 2:00 p.m., the defendants and Jordan approached a neighborhood market which was a known hangout for Phillip Patton's associates. As they rounded the corner to the store, they donned the gloves and ski masks. Shaun Fly Smith called out, "What's up, Kevin?" to Kevin Robinson, and started firing. Jordan fired next, but his gun jammed. [The petitioner] and Ladonte Montez Smith proceeded to fire, as well, as the car drove by the market.

The defendants and Jordan abandoned the car one street over from Dodge City, taking the weapons with them. They threw out as many shells as they could on the way. They ran through a yard and scaled a fence to get into Dodge City. The defendants and Jordan left the weapons in the trunk of a car belonging to one of Shaun Fly Smith's friends. . . .

. . .

. . . Twelve-year-old Jermiyer Warfield, . . . who was in the market purchasing ice cream, was killed by the gunfire. Kevin Robinson was shot in the leg; however, his injuries were not fatal. Congsuinia Holland, Jermiyer Warfield's sixteen-year-old cousin, discovered a bullet hole in her jeans after the incident. Several other people who were in the market escaped injury, despite the extensive gunfire.

Other evidence offered by the state established that Phillip Patton owned the market at which the shooting occurred. The market was managed by Tim Miller and Marcus Jordan. Miller was inside the store at the time of the crimes.

Arnett Hayes identified the car he had loaned to the defendants and Jordan in a photographic exhibit. Several other witnesses identified this vehicle from the photograph, as well. During his testimony, Kevin Robinson identified the photograph of the vehicle in which he had seen three men wearing ski masks with guns pointed out the window. Detective Clinton Vogel, who was walking toward the market at the time of the shooting, identified the same photograph as depicting the vehicle in which he had seen four black males wearing ski masks shooting out of the car at the market. William Seats, who was walking to work at the time of the incident, heard shooting and saw a car with four people wearing ski masks and hoods inside. The car was traveling in the direction of Dodge City. He identified the car in the photographic exhibit. Billy Wright, who lives on a street behind Dodge City, saw a suspicious car park near his house. Four young, black men hurriedly got out of the car and went over the fence behind his house into Dodge City. One of the men had something under his coat. . . . Mr. Wright identified the car from the photograph.

Within a short time after the crimes, officers who arrived at the scene of the shooting and the abandoned car collected evidence, including shells and bullets. A search warrant was executed at the Ashby residence on December 19, two days after the shooting. Guns and ammunition were recovered from the attic area over the kitchen. Photographs of guns and ammunition were also found, although the weapons depicted in these photographs were not recovered.

A forensic scientist testified that 7.62 x. 39 cartridge casings from the crime scene were fired from the same weapon as the same type casings found in the abandoned car. These spent casings had been fired from a semi-automatic or fully

automatic assault rifle. Live 7.62 x 39 rounds recovered from the Ashby residence were the same manufacturer as the spent casings recovered earlier. Spent 9 millimeter bullets recovered had characteristics most commonly seen with firing from a Glock semi-automatic pistol. Markings at the scene were consistent with a shotgun blast, and the ammunition recovered from Ashby's house included shotgun shells. However, none of the weapons recovered from the search of the Ashby house two days after the shooting could be determined to have fired the shell casings recovered.

. . .

Mitchell Smith . . . testified that he was the only person at Ashby's house on December 17 when Arnett Hayes and Chevron McAfee came by. Smith claimed the only guns and ammunition he had ever seen at the Ashby residence was the gun he himself carried. Mitchell Smith essentially denied that any of the defendants were there that day; he denied having seen Jordan at the Ashby house on any occasion.

Shaun Fly Smith took the stand and . . . denied any participation in the shootings with which he was charged. . . . He denied any prior acquaintance with [the petitioner].

[The petitioner] testified on his own behalf. He claimed he was living with his girlfriend, Angelina Majors, in December 1995. He had been temporarily disabled in a car wreck and was unable to work; . . . however, his girlfriend was working at a nursing home on December 17. On that date, the [petitioner] was home cooking dinner. Miss Majors called [the petitioner] on her breaks around 10:00 a.m., 12:30 p.m. and 2:15. She made a third call right before she left work, and she arrived home around 4:00 p.m. [The petitioner] denied any involvement with the shooting on December 17, and he denied any previous acquaintance with his co-defendants, Arnett Hayes, Gary Jordan, Vira [sic] Ashby or Dallas Smith. He denied having ever been to Ashby's house.

[The petitioner] also offered the testimony of Angelina Majors. She echoed [the petitioner's] testimony that she was working on December 17 and that she had called him at their home on her breaks and he was cooking dinner. She acknowledged that she was still romantically involved with [the petitioner] and visited him in jail.

Ebony McAllister testified that she went to [the petitioner's] and Majors' home after she and Majors got off work on December 17, and [the petitioner] was present and had cooked dinner.

Ladonte Montez Smith, et al., 1999 Tenn. Crim. App. LEXIS 1276, at ** 4-15.

## II. POST-CONVICTION RELIEF PROCEEDINGS

During the post-conviction relief hearing, the parties stipulated trial counsel did not file any pretrial motions but orally adopted a number of the motions filed by the other defense attorneys.

### A. Petitioner's Proof

William Terrell "Tiger" Harris testified that on December 17, 1995, between 1:00 and 2:00 p.m., he loaned his vehicle to Arnett Hayes. Later that night, Hayes returned and informed Harris that the vehicle had been "carjacked." Harris stated he provided the police with this information. Harris further stated one of the defense attorneys, who was also aware of this information, contacted him and requested he testify at trial. Harris testified the defense attorney subsequently informed him that his testimony was not needed.

Martin Szeigis, who represented co-defendant Gary Jordan, testified Detective Grady Eleam provided him with a photographic lineup to show Jordan. Szeigis stated he did not know the identity of the suspect in the lineup, and neither he nor the police influenced Jordan's identification of the petitioner.

Szeigis testified that shortly after Jordan surrendered to the police, Jordan expressed his willingness to cooperate and subsequently gave a statement to the police. Szeigis stated that in return for Jordan's testimony, the state agreed to sever his case from his co-defendants' case. Szeigis further stated that although they were "hoping for anything other than first degree," the state did not assure them that Jordan would receive a lesser sentence in exchange for his testimony. According to Szeigis, the state only assured them that Jordan's "cooperation would be taken into consideration and that his case would be severed and he would not be going to trial with the co-defendants." Szeigis testified that three months after the petitioner's trial, Jordan pled guilty to second degree murder and attempted first degree murder and received consecutive sentences of fifteen years at 100% for second degree murder and ten years at 30% for attempted first degree murder.

Billy Wright stated that prior to testifying at trial, he was not present inside the courtroom while other witnesses testified.

Detective Grady Eleam, who investigated the shooting, testified he prepared a report regarding his interview with "Tiger" Harris, who had been on a "drug binge" for a period of time prior to the interview. Harris informed Detective Eleam that he had pawned his vehicle to Arnett Hayes and that Hayes told Harris that the vehicle had been "carjacked." Detective Eleam testified he prepared a photographic lineup which included the petitioner's photograph. He stated he did not personally show the lineup to Jordan but gave it to Jordan's attorney who then showed it to Jordan.

Virie Ashby testified that one month prior to the petitioner's trial, she pled guilty to accessory after the fact of murder as a result of the shooting. She, nevertheless, testified that prior to being questioned by the police, she had never heard of the petitioner nor had he ever been to her residence.

Ashby further stated that on the day of the shooting, she was at church, and the petitioner, Arnett Hayes, and Gary Jordan were not at her residence. Ashby denied knowing who hid the automatic weapons and ammunition found inside of her attic.

Ashby testified trial counsel never contacted her prior to trial and that had he done so, she would have likely been unwilling to testify. Ashby stated she knew she could not be interviewed because she was then represented by counsel. She further stated she did not want to testify at trial because she was "concerned" for herself. Ashby maintained her plea agreement was contingent upon her not testifying at trial.

Dallas Smith testified that in December 1995, he was living with Ashby, his girlfriend. He stated he did not know the petitioner and never saw him at his residence. Smith further stated he was not present at his residence on the day of the shooting and did not know who placed the guns inside his residence. Smith testified trial counsel never contacted him and that he testified at co-defendant Ladonte Smith's juvenile transfer hearing.

The petitioner testified the attorney who initially represented him filed for discovery, and they reviewed it together. The petitioner stated he subsequently fired the attorney, and his family hired trial counsel. The petitioner further stated trial counsel met with him on two or three occasions prior to trial for a total of approximately two hours.

The petitioner testified that upon being retained, trial counsel questioned him regarding a possible defense, and the petitioner provided trial counsel with the names of his girlfriend and her friend as alibi witnesses. The petitioner stated he was "fine" with the alibi defense "[v]erses [sic] anything [he] could have come up with." The petitioner testified that although trial counsel stated he would interview the state's witnesses, he never reported the results of the interviews to the petitioner. The petitioner stated he was unaware of whether trial counsel was working with the co-defendants' counsel in preparing for trial. The petitioner testified the state provided trial counsel with four additional reports as discovery materials and that trial counsel failed to provide him with the reports. These materials included a report regarding a tip that the police received from an anonymous caller.

The petitioner testified that during trial, he observed witness Billy Wright sitting inside the courtroom for approximately one hour while other witnesses testified. The petitioner stated he informed trial counsel who instructed him "not to worry about it." The petitioner then recalled the testimony of Frankie Blakely, Hayes' grandmother. The petitioner stated that during trial, the trial judge referred to Blakely as a "church woman."

**B. State's Proof**

Trial counsel was deceased at the time of the post-conviction hearing. Katherine Ryan, who was his legal secretary and paralegal prior to trial counsel's death, testified the petitioner's case was

of the highest priority, and trial counsel worked a "substantial" amount of hours on the case. Trial counsel also worked with the other two defense attorneys in preparing for trial.

Ryan stated she participated in contacting the two alibi witnesses and scheduling their meeting with trial counsel. Ryan further stated that although she had no personal knowledge of interviews between trial counsel and other witnesses, trial counsel's failure to interview these witnesses would have been "unusual." Ryan explained she did not have access to the petitioner's file because trial counsel closed his office once he became ill, and the majority of the files were then purged.

Monte Watkins testified he was appointed to represent co-defendant Ladonte Smith, while Carlton Lewis represented co-defendant Shaun Smith. Watkins stated he, Lewis, and trial counsel met to discuss the case on three or more occasions. On one occasion, the defense attorneys met at the district attorney's office for a pretrial conference during which time they reviewed all of the physical evidence and discussed the testimony of the witnesses, the ballistics report, and an overview of the entire case. Watkins testified the defense attorneys also met after the pretrial conference and discussed their defenses. Watkins stated trial counsel planned to present an alibi defense, and the petitioner was the only defendant who had "any kind of real defense."

Watkins testified he interviewed "Tiger" Harris who stated he had pawned his vehicle to Arnett Hayes. He stated he decided not to call Harris as a witness at trial. Watkins further stated he interviewed Detective Clint Vogel and Detective Grady Eleam. Watkins explained he was unable to interview Gary Jordan and Virie Ashby because they were both represented by counsel. Watkins stated he was unable to locate the remaining witnesses.

Watkins testified someone had attempted to kill Hayes, and as a result, Hayes went into hiding and was, therefore, unavailable for interviews. Watkins said the state provided the defense attorneys with Hayes' tape recorded statement to the police and the transcript of co-defendant Ladonte Smith's juvenile transfer hearing during which Hayes testified.

Watkins testified he believed the state provided him with all Jencks material prior to trial and that he was not surprised by any of the evidence which the state presented at trial. In regard to the items listed in the petitioner's post-conviction relief petition as exculpatory evidence which the state allegedly withheld, Watkins stated the only item with which he was unfamiliar was the TBI report of an anonymous telephone call. Watkins testified he had viewed or was familiar with the information provided in the remaining items listed in the petition.

Tom Thurman, the assistant district attorney general who prosecuted the case, testified he answered the discovery motion filed by the petitioner's original defense counsel. Trial counsel then began representing the petitioner and filed a notice of an alibi defense as well as affidavits from the alibi witnesses relating to their proposed testimony. Thurman stated he subsequently sent trial counsel a letter which included the final autopsy report, a report of the fingerprint test results, Ashby's

statement, and information which the police received from an anonymous individual who had called on two separate occasions and identified three possible suspects.

Thurman testified he did not provide the defense with a TBI report regarding an anonymous caller who identified "Sydney Allen" as having been involved in a drive-by shooting in December 1995. Thurman stated he was unaware of the report prior to receiving the post-conviction relief petition. Thurman explained that the report was dated January 16, 1996, approximately two weeks prior to the return of the indictments, and the report was likely not included in the state's original file. Thurman maintained that had he known about the report, he would have provided it to the petitioner as possible exculpatory evidence. However, Thurman stated Allen's name never appeared during the state's investigation, and whether the anonymous caller was referring to this particular shooting was unclear from the report.

Thurman testified Officer David Pugh's report regarding a latent fingerprint lifted from the vehicle used in the shooting would have been provided to the defense as Jencks material. Thurman stated he did not believe the report was exculpatory because the fingerprint was not a useable print. Thurman further stated he believed the parties discussed the report during the pretrial conference, and testimony was presented at trial regarding the report. Thurman testified he also provided the defense attorneys with Detective Eleam's report regarding a fingerprint which was lifted from an ammunition box found at Ashby's residence, which did not belong to any of the defendants. Thurman recalled that Detective Al Gray testified at trial regarding the fingerprint.

Thurman stated Jordan did not have an agreement with the state prior to testifying at trial. According to Thurman, Jordan's case was severed from the co-defendants' case, and Thurman informed Jordan that he would provide "consideration" if Jordan testified truthfully at trial. Thurman stated Jordan's tape recorded statement which the state provided to the defense revealed this information. Thurman further stated that after trial, the state provided Jordan with "consideration" through his sentence.

Thurman testified he provided the defense with Detective Eleam's report regarding his interview with Harris as Jencks material. Thurman stated the attorney who represented co-defendant Ladonte Smith at his juvenile transfer hearing cross-examined Detective Eleam on this information. Thurman further stated he provided the defense with Hayes' tape recorded statement to the police in which he discussed his initial claim that the vehicle was "carjacked."

Thurman testified an anonymous caller contacted the police on two separate occasions and provided them with the names of co-defendant Shaun Smith and two individuals who were not charged. Thurman stated both Detective Putman and Detective Fuqua prepared separate reports regarding the caller. Thurman explained he provided the defense with Detective Fuqua's report which was more detailed and listed the addresses of the three suspects.

Thurman testified he believed he provided the defense with Detective Eleam's report regarding ballistics tests conducted by TBI Agent Heflin as Jencks material. Thurman further stated

-9-

the defense received Agent Heflin's final report; the parties discussed the report during the pretrial conference; and Agent Heflin's testimony at trial was consistent with the information provided in the report.

Thurman testified that after Hayes agreed to testify at trial, two people attacked Hayes and shot him twice in the head. Although Hayes survived, he became afraid and went into hiding. The state contacted Hayes by leaving a message with his grandmother requesting he call. Thurman stated Hayes refused to be interviewed by the defense; however, prior to the attack, Hayes gave a tape recorded statement to the police and testified under oath at co-defendant Ladonte Smith's juvenile transfer hearing. Thurman stated he provided the defense with the tape recorded statement and a transcript of the hearing. Thurman testified co-defendants Jordan and Ashby were unavailable for interviews because they were represented by counsel. Thurman further stated the parties discussed the testimony of the remaining witnesses during the pretrial conference.

Thurman McLean, who represented Ashby in the case, testified Ashby's plea agreement did not contain any contingencies requiring her not to testify at the petitioner's trial. McLean recalled that because Ashby was afraid, he arranged for her plea hearing to be held in the afternoon when the courtroom would be less populated. McLean stated Carlton Lewis approached him regarding Ashby's role as a potential defense witness; however, when McLean informed Lewis that Ashby had entered a guilty plea, Lewis lost interest.

## III. POST-CONVICTION COURT'S FINDINGS

In a written order denying the petition, the post-conviction court found the petitioner failed to establish that the state withheld exculpatory evidence which was prejudicial to the outcome of the trial. The court noted that according to Thurman's testimony, the TBI report regarding an anonymous tip was the only document listed in the petition that the state failed to furnish. The court further noted Thurman testified the omission was not intentional. The post-conviction court found the petitioner failed to establish the withholding of the report resulted in prejudice. The court further found the petitioner failed to present sufficient evidence to support his remaining claims of withholding exculpatory evidence.

In regard to the petitioner's allegations that the state failed to correct perjured testimony of Arnett Hayes, Detective Eleam, and Gary Jordan, the post-conviction court found the petitioner failed to establish the testimony was perjurous or that the state's failure to correct the testimony resulted in prejudice. The court noted any alleged inconsistencies between the witnesses' testimony and their prior statements were adequately addressed through cross-examination at trial.

The post-conviction court found the petitioner's claim that the state failed to reveal an agreement with Jordan was without merit. The court noted that according to the record, the state only promised Jordan severance from the other co-defendants if Jordan gave a truthful statement, and Jordan's counsel stated he did not relay any specific offers to Jordan prior to his testimony at trial. The post-conviction court found the petitioner failed to establish he suffered prejudice as a

result of the trial court's reference to a witness as a "church woman" and noted that in the context in which the term was used, the trial court did not intend to influence the jury nor did it do so. The court further found the petitioner failed to establish that any alleged violation of the sequestration rule impacted Billy Wright's testimony or resulted in prejudice.

In regard to the petitioner's claim of ineffective assistance of counsel, the post-conviction court found the petitioner failed to establish trial counsel was deficient and that any alleged deficiency resulted in prejudice. The court noted that according to Ryan's testimony, trial counsel spent a significant amount of time preparing the case for trial. The court further noted Watkins' testimony that all defense counsel met on at least three occasions and discussed the case. The post-conviction court found that based upon the record and the evidence presented during the hearing, trial counsel competently represented the petitioner and diligently prepared the case for trial. Finally, the court noted trial counsel employed his extensive experience in making strategic decisions regarding objections, motions, jury instructions, and argument.

## IV. STANDARD OF REVIEW

The post-conviction judge's findings of fact on post-conviction hearings are conclusive on appeal unless the evidence preponderates otherwise. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). Those findings of fact are afforded the weight of a jury verdict, and this court is bound by the findings unless the evidence in the record preponderates against those findings. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). This court may not reweigh or reevaluate the evidence, nor substitute its inferences for those drawn by the post-conviction court. State v. Honeycutt, 54 S.W.3d 762, 766 (Tenn. 2001). However, the post-conviction court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

## V. EXCULPATORY EVIDENCE

The petitioner contends the state withheld exculpatory evidence at trial in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, the petitioner maintains the state withheld witness Gary Jordan's statement to the police, ballistic reports, police reports regarding anonymous telephone calls, fingerprint evidence, and William Terrell Harris' statement to the police. The petitioner further submits the state's withholding of this evidence resulted in prejudice. We disagree.

### A. **Brady** Standards

In Brady v. Maryland, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97; *see also* Sample v. State, 82 S.W.3d 267, 270 (Tenn. 2002). The duty to disclose extends to all "favorable information" regardless of whether the evidence is admissible

at trial. Johnson v. State, 38 S.W.3d 52, 56 (Tenn. 2001). In United States v. Bagley, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380, 87 L. Ed. 2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the Brady rule. However, the state is not required to disclose information that the defendant already possesses or is able to obtain. State v. Marshall, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992).

Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. *See* Bagley, 473 U.S. at 674-75, 105 S. Ct. at 3379-80; Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Evidence is considered material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. Kyles v. Whitley, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995); Edgin, 902 S.W.2d at 389.

In order to prove a Brady violation, a defendant must show that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566; *see also* Strickler v. Greene, 527 U.S. 263, 290, 119 S. Ct. 1936, 1952, 144 L. Ed. 2d 286 (1999). The Court in Kyles urged that the cumulative effect of the suppressed evidence be considered to determine materiality. 514 U.S. at 436, 115 S. Ct. at 1567.

## B. Gary Jordan's Prior Statement

The petitioner first contends the state withheld witness Gary Jordan's statement to the police. The petitioner submits he could have utilized this statement to impeach Jordan's credibility as a witness at trial by showing that Jordan anticipated receiving a plea bargain and was biased against a co-defendant due to a prior drug deal. However, Thurman testified he provided the defense with Jordan's tape recorded statement, and Watkins, who represented a co-defendant, testified he had viewed or was familiar with all of the documents that the state allegedly withheld other than the TBI report regarding an anonymous tip. Jordan testified at trial that the state agreed to sever his case from his co-defendants' case in exchange for his testimony and that he hoped to gain favorable consideration from the state regarding his sentence. *See* Ladonte Montez Smith, et al., 1999 Tenn. Crim. App. LEXIS 1276, at *6. Accordingly, the petitioner has failed to establish a Brady violation.

## C. The Ballistics Reports

The petitioner maintains the state withheld ballistics reports which he could have utilized in impeaching the state's witnesses at trial regarding the number of weapons involved in the shooting. However, Thurman testified he provided the defense with Detective Eleam's preliminary report of ballistics tests performed by TBI Agent Heflin as Jencks material and with Agent Heflin's final report of the results of the ballistics tests. Watkins stated he received all Jencks material from the state prior to trial, and both Watkins and Thurman testified the parties discussed the ballistics reports

-12-

at the pretrial conference. The post-conviction court accredited Thurman's testimony. Therefore, we conclude the petitioner has failed to establish that the state suppressed this evidence.

## D. Reports on Anonymous Tips

The petitioner maintains the state suppressed various police reports concerning anonymous callers who identified potential suspects and, thereby, deprived him of the ability to investigate these suspects and cross-examine the state's witnesses at trial regarding these suspects.

According to Thurman's testimony at the post-conviction hearing, an anonymous individual contacted the police on two separate occasions and identified the same three suspects: co-defendant Shaun Smith and two individuals who were not charged. Detectives Putman and Fuqua prepared separate reports regarding the information, and the state provided the defense with Detective Fuqua's report which was more detailed and listed the addresses of the three suspects. Therefore, the petitioner has failed to establish a Brady violation.

However, Thurman stated he was unaware of and, thus, failed to provide the defense with a TBI report relating to an anonymous caller who identified "Sydney Allen" as being involved in a drive-by shooting in December 1995. Watkins confirmed he did not receive that report. Thurman explained that had he been aware of the report's existence, he would have provided it to the defense as possible exculpatory evidence.

We conclude the petitioner failed to establish that the report was material. As indicated by Thurman's testimony, the report does not specify the shooting to which the anonymous caller was referring. Thurman further stated Allen's name never arose during the course of the state's investigation of this case. Finally, the petitioner failed to present any evidence at the post-conviction hearing regarding Allen's alleged involvement in the offenses. Therefore, we are unable to conclude that had the state disclosed the report to the petitioner, the results of the proceedings would have been different.

## E. Fingerprint Evidence

The petitioner next maintains the state failed to disclose fingerprint evidence, thus denying him the opportunity to conduct an independent fingerprint analysis. (P's Brief, p. 14) However, Thurman testified he provided the defense with Detective Eleam's report concerning a fingerprint which did not belong to any of the defendants and which officers lifted from an ammunition box at Ashby's residence. Furthermore, Detective Al Gray testified at trial regarding this fingerprint. Thus, the petitioner has failed to establish that the state suppressed this report.

Officer David Pugh also prepared a report regarding a latent fingerprint which officers lifted from the vehicle used in the shooting. According to Thurman's testimony, the fingerprint was tested and determined to be unusable. Thurman further testified that although he did not believe the report was exculpatory, he provided the report to the defense as Jencks material and believed the parties

discussed the report during the pretrial conference. Watkins stated he received all <u>Jencks</u> material prior to trial. Therefore, we conclude the petitioner failed to establish that the state suppressed the report or that the report was exculpatory.

**F. William Terrell Harris' Statement**

Finally, the petitioner contends the state suppressed Harris' statement to the police. The petitioner maintains the suppression denied him the opportunity to present Harris as a witness at trial and hindered his ability to impeach Arnett Hayes' credibility as a witness at trial. We disagree.

Detective Eleam prepared a report regarding an interview with Harris. Thurman testified that prior to trial, he provided the report to the defense including the attorney who represented co-defendant Ladonte Smith at his juvenile transfer hearing. The attorney then used the information in cross-examining Detective Eleam during the hearing. Both Thurman and Watkins indicated that the state provided the defense with a transcript of the hearing. Watkins further testified Detective Eleam's report appeared "familiar," he interviewed Harris, and he was aware of the information in the report. Therefore, the petitioner has failed to establish that the state withheld this evidence.

## VI. FAILURE TO CORRECT PERJURED TESTIMONY

The petitioner contends the state failed to correct perjured testimony of its witnesses at trial in violation of his due process rights. We conclude this contention is without merit.

The state may not knowingly present false testimony and has an affirmative duty to correct the false testimony of its witnesses. *See* <u>Giglio v. United States</u>, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972); <u>State v. Spurlock</u>, 874 S.W.2d 602, 617 (Tenn. Crim. App. 1993). The state's failure to correct false testimony of a witness violates due process of law as guaranteed by the United States and Tennessee constitutions. <u>Giglio</u>, 405 U.S. at 153-54; <u>Spurlock</u>, 874 S.W.2d at 618. In order to obtain a new trial, the accused must establish that the prosecution presented false testimony, which it knew to be false, and that the testimony was material. <u>State v. Cureton</u>, 38 S.W.3d 64, 74-75 (Tenn. Crim. App. 2000). In determining the materiality of the testimony, the inquiry becomes whether a reasonable likelihood exists that the false testimony could have affected the jury's judgment. *See* <u>Giglio</u>, 405 U.S. at 154.

The petitioner contends the state failed to correct the following allegedly false testimony at trial:

(1) Detective Eleam testified at trial that the police presented Gary Jordan with a photographic lineup in which Jordan identified the petitioner, whereas Jordan's attorney actually presented the lineup to Jordan;

(2) Arnett Hayes' testimony at trial differed from his "pre-trial testimony" regarding whether the petitioner possessed a ski mask on the date of the shooting;

-14-

(3) Jordan explained in his statement to the police that he attempted to enter Virie Ashby's residence after the shooting, whereas at trial, he testified regarding other places to which he fled;

(4) Jordan testified at trial that he was not upset with co-defendant Shaun Smith regarding drugs obtained in a robbery, whereas he explained in his statement to the police that he and Smith had a "falling out" over the incident; and

(5) Jordan testified at trial that he hoped to receive leniency for testifying, whereas he had been told prior to trial that he would receive a plea agreement.

We conclude that the petitioner had access to all of this information at the time of trial. By failing to raise the issue of perjured testimony on direct appeal, it may not be raised in a post-conviction context as an independent basis for relief. Regardless, the allegations are without merit.

As to the first four allegations, we agree with the post-conviction court's finding that this testimony had no prejudicial effect on the outcome of the trial. As to the first contention, although Jordan's counsel was the person who showed the photographic lineup to Jordan, counsel testified he did not influence Jordan in his identification. The person who showed the lineup to Jordan was immaterial. As to the second contention, the testimony of other witnesses at trial established that the perpetrators were wearing ski masks during the shooting. In our view, whether Hayes actually saw the petitioner with a ski mask at the residence before the shooting was not significant. Both at the juvenile transfer hearing and at the trial, Hayes testified the petitioner and the other perpetrators secured weapons before leaving the residence. As to the third contention, Jordan's testimony at trial was consistent with his statement to the police regarding other places to which he fled after the shooting. The fact that he did not mention the Ashby residence does not establish perjury nor prejudice to the outcome of the trial. Finally, regardless of whether Jordan and co-defendant Shaun Smith had a "falling out," Jordan's testimony at trial relating to the actual events of the shooting was consistent with his statement. Accordingly, the petitioner has failed to demonstrate a reasonable likelihood that the challenged testimony could have affected the jury's judgment.

Furthermore, the petitioner has failed to establish that a plea agreement existed between Jordan and the state which Jordan failed to reveal at trial. At the post-conviction hearing, both Thurman and Jordan's trial counsel testified that prior to trial, the state agreed to sever Jordan's case from his co-defendants' case and provide him with "consideration" in exchange for his truthful statement. Jordan also testified to this "agreement" at trial and stated he hoped to gain favorable consideration at sentencing. While Jordan may have hoped his testimony would result in favorable treatment, the record does not establish any further agreement existed between the state and Jordan at the time of the petitioner's trial. *See* Hartman v. State, 896 S.W.2d 94, 101-02 (Tenn. 1995). Moreover, the fact that Jordan later pled guilty to lesser charges and received a lesser sentence does not establish the existence of a prior agreement. *See* State v. Williams, 690 S.W.2d 517, 525 (Tenn. 1985). Accordingly, this argument is without merit.

## VII.  INEFFECTIVE ASSISTANCE OF COUNSEL

The petitioner contends he received ineffective assistance of counsel at trial.  Specifically, he maintains trial counsel was ineffective in failing to investigate the facts and interview witnesses, in failing to file a motion to suppress Gary Jordan's pre-trial identification of the petitioner, in failing to call witnesses at trial, in failing to effectively cross-examine the state's witnesses at trial, in allowing a witness for the state to testify in violation of the rule of sequestration, in failing to object to the trial court's comment regarding a witness for the state, and in failing to request and present evidence supporting an accomplice instruction as to Arnett Hayes.

### A.  Standards

For a petitioner to successfully overturn a conviction based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases."  Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).  Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense."  Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  Should the petitioner fail to establish either factor, the petitioner is not entitled to relief.  Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim.  Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).  The petitioner is not entitled to the benefit of hindsight; the petitioner may not second-guess a reasonably based trial strategy; and the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case.  Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); see Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

The petitioner bears the burden of proving his allegations by clear and convincing evidence.  Tenn. Code Ann. § 40-30-110(f) (2003).  The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them.  See Jaco, 120 S.W.3d at 830.

### B.  Failure to Investigate and Interview Witnesses

The petitioner submits trial counsel failed to adequately investigate the case in that he did not review Hayes' prior sworn testimony, did not file any pretrial motions, met with the petitioner only two hours, and did not insist on complete discovery from the state.  However, Katherine Ryan, trial

counsel's paralegal, testified the petitioner's case was of the highest priority and that trial counsel worked for a "substantial" amount of hours in preparing for trial. Thurman testified trial counsel filed a notice of an alibi defense along with accompanying affidavits and received discovery from the state, including Hayes' tape recorded statement to the police and a transcript of co-defendant Ladonte Smith's juvenile transfer hearing during which Hayes testified. According to Watkins, counsel for a co-defendant, all defense counsel met on three or more occasions to discuss the case; they met with the state during a pretrial conference during which they reviewed all the physical evidence and discussed the witnesses' testimony and an overview of the entire case. Watkins stated defense counsel met after the pretrial conference and discussed their defenses. Although trial counsel did not file any pretrial motions, he orally adopted motions filed by the other defense attorneys. The post-conviction court found trial counsel diligently prepared for trial and represented the petitioner in a competent and thorough manner. The evidence does not preponderate against the findings of the post-conviction court.

The petitioner further maintains trial counsel failed to interview Virie Ashby, Detective Eleam, and William Terrell Harris. However, the evidence presented at the post-conviction hearing establishes that Ashby was unavailable for interviews because she was then represented by counsel. Thurman testified he provided trial counsel with Ashby's statement to the police. Although Detective Eleam was unable to recall whether he had spoken with trial counsel, Thurman stated he observed trial counsel speaking to various law enforcement officers in the hallway and that he provided trial counsel with reports prepared by Detective Eleam. Watkins testified he interviewed Detective Eleam and that the parties discussed the proposed testimony of the witnesses during the pretrial conference.

Finally, Watkins testified he interviewed Harris who stated he had pawned his vehicle to Hayes; Watkins was familiar with the information in Detective Eleam's report regarding the detective's interview with Harris; and Watkins decided against calling Harris as a witness at trial. As noted above, Watkins further stated defense counsel discussed the testimony of the witnesses during the pretrial conference. Furthermore, at the post-conviction relief hearing, Harris acknowledged he had spoken to a defense attorney prior to trial and the defense attorney later informed him that his testimony was not needed. Accordingly, the petitioner had failed to demonstrate trial counsel was deficient in failing to interview witnesses and that any deficiency resulted in prejudice.

## C. Failure to File a Motion to Suppress

The petitioner next submits that trial counsel was ineffective in failing to file a motion to suppress Jordan's pretrial identification of the petitioner in a photographic lineup. We disagree.

Convictions based on eyewitness identification at trial following a pre-trial photographic identification will be set aside only if the photographic identification was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384, 88 S. Ct. 967, 971, 19 L. Ed. 2d 1247 (1968). According to the evidence presented at the post-conviction relief hearing, Detective Eleam prepared a photographic lineup and presented it to Jordan's counsel, who then presented it to Jordan. Jordan subsequently

identified the petitioner from the lineup. Jordan's counsel described the lineup as a standard police lineup with six photographs; he did not know the identity of the suspect in the lineup; and neither he nor the police influenced Jordan in identifying the petitioner. Based upon this limited evidence, we are unable to conclude that if trial counsel filed a motion to suppress, the trial court would have granted the motion. Therefore, the petitioner has failed to demonstrate deficiency or prejudice.

## D. Failure to Call Witnesses at Trial

The petitioner claims trial counsel was ineffective in informing the jury during his opening statement that Virie Ashby would testify and then failing to call her as a witness at trial. The petitioner argues that Ashby's testimony would have discredited Gary Jordan's testimony and would have supported the petitioner's testimony that he had never been to Ashby's residence.

This court has noted the potential adverse effect resulting from a trial counsel's failure to present evidence promised during opening statements. *See* State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991). However, regardless of any deficiency, we conclude the petitioner has failed to establish prejudice. According to the evidence presented at the post-conviction relief hearing, Ashby was reluctant to testify at trial and had pled guilty prior to trial to charges resulting from the shooting. Her post-conviction testimony was seemingly at odds with her plea of guilty to accessory after the fact. It is certainly understandable why she was not called as a witness. Although Ashby testified at the post-conviction hearing that the petitioner was not at her residence on the date of the shooting, she further testified she also was not present at her residence on that date. After counsel's opening statement, the trial jury heard incriminating testimony about Ashby's involvement. Although trial counsel may well have been deficient in indicating Ashby would be a witness, we are unable to conclude that this statement or the actual decision not to call Ashby was prejudicial in terms of rendering a reasonable probability that the result of the trial was unreliable or the proceedings fundamentally unfair. *See* Strickland, 466 U.S. at 687.

The petitioner further submits that trial counsel was ineffective in failing to call Mario McGee, whom he alleges would have impeached Hayes' testimony as to the individuals present at Ashby's residence on the date of the shooting. However, McGee did not testify at the post-conviction relief hearing. *See* Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (holding that when a petitioner claims trial counsel was ineffective in failing to present witnesses at trial, the petitioner should present the witnesses at the evidentiary hearing in order to establish prejudice). Accordingly, this argument is without merit.

## E. Failure to Adequately Cross-Examine Witnesses

The petitioner claims trial counsel failed to adequately cross-examine Gary Jordan at trial regarding any agreements he had with the state in exchange for his testimony. However, as we have previously noted, the proof establishes that in exchange for Jordan's truthful statement, the state agreed to sever his case from his co-defendants' case and to provide him with "consideration." Jordan testified to this "agreement" at trial. Accordingly, this argument is without merit.

The petitioner further claims trial counsel failed to adequately cross-examine Arnett Hayes at trial regarding his drug activities, his knowledge of the petitioner, and his inconsistent testimony at trial and at prior proceedings. However, the post-conviction court found that any inconsistencies in the testimony of the various witnesses were adequately addressed at trial during cross-examination. At the post-conviction hearing, the petitioner recalled that trial counsel attempted to question Hayes at trial as to whether he was a drug dealer, and the trial court refused to permit it. Furthermore, the petitioner has failed to establish that any alleged deficiency resulted in prejudice. This argument lacks merit.

## F. Failure to Object to Violation to Sequestration of Witnesses

The petitioner contends trial counsel was ineffective in failing to object to the testimony of witness Billy Wright, who was inside the courtroom during the testimony of other witnesses at trial. *See* Tenn. R. Evid. 615 (requiring exclusion of witnesses from courtroom except during their testimony). At the post-conviction relief hearing, Wright stated that prior to testifying at trial, he did not remain inside the courtroom while other witnesses testified. The post-conviction court found the petitioner failed to establish that any alleged violation of the sequestration rule impacted Wright's testimony and resulted in prejudice. The evidence does not preponderate against the findings of the post-conviction court.

## G. Failure to Object to Trial Judge's Comment

The petitioner submits trial counsel was ineffective in failing to object or request a curative instruction regarding the trial judge's characterization of state witness Frankie Blakely as a "church woman." The post-conviction court found the petitioner failed to establish prejudice and noted that in the context in which the term was used, the trial court did not intend to influence the jury nor did it do so. The evidence does not preponderate against the post-conviction court's findings.

## H. Failure to Request an Accomplice Instruction

Finally, the petitioner maintains trial counsel was ineffective in failing to request a jury instruction regarding Arnett Hayes' role as an accomplice and in failing to present evidence supporting an instruction. We disagree.

An accomplice is a person who knowingly, voluntarily and with a common intent unites with the principal offender in the commission of a crime. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). On direct appeal, the petitioner claimed the trial court erroneously failed to instruct the jury that Hayes was an accomplice as a matter of law or, in the alternative, that the trial court erroneously failed to submit the question of whether Hayes was an accomplice to the jury as the trier of fact. Ladonte Montez Smith, et al., 1999 Tenn. Crim. App. LEXIS 1276, at *23. A panel of this court held that the petitioner waived the issue by failing to request a special instruction and by failing to object at trial. *Id.* at **28-29. This court further held that regardless of waiver, no basis for concluding that Hayes was an accomplice as a matter of law existed. *Id.* at *28. This court

further noted that although the evidence presented at trial might have raised the issue of Hayes' role as a facilitator, the evidence did not fairly raise the issue of his role as an accomplice. *Id.* We conclude the petitioner has failed to establish that any alleged deficiency resulted in prejudice.

## VIII.  CONCLUSION

In summary, we conclude the petitioner failed to establish that: (1) the state violated <u>Brady</u>; (2) the state did not correct perjured testimony at trial; or (3) he received ineffective assistance of counsel at trial.  Accordingly, we affirm the judgment of the post-conviction court.


_____
JOE G. RILEY, JUDGE